<pre>
 1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 2
                                     Criminal No.
 3                                   95-10027-WGY

 4
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 5                                   *
   UNITED STATES OF AMERICA          *
 6                                   *
   v.                                *    CHANGE OF PLEA
 7                                   *
   EDWARD FLAHERTY                   *
 8                                   *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 9

10
             BEFORE:  The Honorable William G. Young,
11                         District Judge

12

13

14 APPEARANCES:

15          UNITED STATES ATTORNEY'S OFFICE (By David
       J. Apfel, Assistant United States Attorney),
16     Post Office Square, Boston, Massachusetts, on
       behalf of the Government
17

18          LAW OFFICES OF STEPHEN B. HRONES (By
       Stephen B. Hrones, Esq.), Boston, Massachusetts,
19     on behalf of Edward Flaherty

20

21

22

23
                                   Post Office Square
24                                 Boston, Massachusetts

25                                 March 30, 1995
</pre>

1          **THE CLERK:**  All rise.  Court is in session.

2          Calling Criminal Action No. 95-10027, the United

3     States v. Joseph Nuzzo and Edward Flaherty.

4          **MR. HRONES:**  Your Honor, may my client join me at

5     the table?

6          **THE COURT:**  He may.

7          **MR. HRONES:**  Thank you.

8          **THE COURT:**  And would counsel identify themselves.

9          **MR. APFEL:**  Your Honor, David Apfel for the United

10    States.

11         **MR. HRONES:**  Stephen Hrones for the defendant,

12    Edward Flaherty.

13         **MR. KEEFE:**  Judge, William Keefe from John

14    McBride's office on behalf of Mr. Nuzzo.

15         **THE COURT:**  All right.  Now, do I understand,

16    Mr. Hrones, that Mr. Flaherty is prepared to change his

17    plea?

18         **MR. HRONES:**  Yes.

19         **THE COURT:**  And with respect to Mr. Nuzzo, you

20    would like a continuance because there are ongoing

21    discussions.  Maybe I should set another status date?

22         **MR. KEEFE:**  That's correct, Judge, either a status

23    date or trial date.  There are a few matters which need to

24    be ironed out prior to completing his case.

25         **THE COURT:**  I think it makes sense to set a status

1   date.  A trial date I set on Monday because that's when we

2   impanel juries.  So, if the government agrees, I will

3   continue it for a short period for a further status, and

4   then if it's a trial we'll set it down for a prompt trial.

5          Is that satisfactory to the government?

6          **MR. APFEL:**  That is satisfactory, your Honor.

7          **THE COURT:**  Do either of you want to suggest a

8   date?

9          **MR. APFEL:**  I would suggest two weeks from today if

10  that is convenient for the Court.

11         **THE COURT:**  Let me speak with the clerk.

12         (Whereupon the Court and the Clerk conferred.)

13         **THE COURT:**  2:30 on Thursday, the 13th of April.

14  Is that satisfactory?

15         **MR. KEEFE:**  That is satisfactory.

16         **THE COURT:**  Very well.  The matter is continued

17  until that time.  And Mr. Flaherty may come forward to be

18  inquired of.

19         (Whereupon the Court and the Clerk conferred.)

20         **MR. APFEL:**  Your Honor, could we --

21         **THE COURT:**  Mr. Keefe, you're excused.

22         **MR. APFEL:**  Your Honor, one thing before Mr. Keefe

23  leaves.  Would it be possible to make clear on the record

24  that the time between today's date and April 13th would

25  be --

1    **THE COURT:**  I should have made it clear and forgive

2    me.  This is your motion, Mr. Keefe, so you'll have no

3    objection if I exclude the time.

4    **MR. KEEFE:**  I do not, your Honor.

5    **THE COURT:**  The continuance having been sought by

6    the defendant, the time is excluded under the provisions of

7    the Speedy Trial Act.

8    Mr. Flaherty may come forward to be inquired of.

9    **THE CLERK:**  Sir, would you raise your right hand.

10   Do you solemnly swear that the answers you will

11   give to this Court will be the truth, the whole truth, and

12   nothing but the truth, so help you God?

13   **THE DEFENDANT:**  Yes, I do.

14   **THE COURT:**  Please be seated.

15   **INQUIRY BY THE COURT**

16   **Q**   Would you state your name, sir?

17   A    My name is Edward Brian Flaherty.

18   **Q**   Mr. Flaherty, my name's William Young.  I'm the judge

19   who is charged with presiding over this session of the

20   Court.  Your attorney says that you desire to change your

21   plea from not guilty to guilty to at least certain counts of

22   a multi-count indictment.

23   Before I can accept your plea there's various

24   things that I need to know.  I need to know that you know

25   that you're competent, that you know what you're doing.  I

1    need to know that you know what you're giving up if you

2    plead guilty because you give up things that are very

3    important to you.

4            I need to know that you know what you may be

5    letting yourself in for by pleading guilty.  I need to know

6    that the government has enough evidence that if the case

7    went to trial you could be found guilty of these charges.

8    And I need to know that you're the one who's decided that

9    this is what you want to do under all the circumstances,

10   that it's a free choice of yours in the sense that,

11   confronted by this charge and the imminence of trial and the

12   whole circumstances in which you find yourself, you've

13   decided that the best course is to plead guilty.

14           Now, to find these things out I ask you questions.

15   If you don't understand any of my questions I want you to

16   stop me, tell me what the problem is so I can ask you a

17   question that you understand.  You have to understand every

18   one of my questions.

19           Do you understand that?

20   A   Yes, I do.

21   Q   If, at any time, you want to talk with Mr. Hrones you

22   have every right to.  You can, he'll come up and you just

23   talk to him right there.  I'll step down over here and you

24   can talk briefly to him.

25           If you have any questions you want to ask me, you

1    can do that.  I'll try to answer them.  If as we talk and

2    you size me up, I'm the judge who is charged with this case,

3    you decide you would just as soon not plead guilty and go to

4    trial you have that right.  You can stop us at any time.  I

5    will tell you now I won't be disturbed.  I have other things

6    to do.  We'll set the case down for trial.  I'm not going to

7    be angry in the least if you exercise what is your

8    constitutional right which is to have a trial.  And you

9    won't be punished for going to trial.

10             Do you understand that?

11   A    Yes, your Honor, I do.

12   Q    All right.  There's another side to that and it's this.

13   When we get all done, if I am satisfied with the answers to

14   the questions, I think you know what you're doing, you're

15   voluntarily pleading guilty, I will ask the clerk to accept

16   the plea.  And she will then ask you:  Do you wish to change

17   your plea?  If your answer to that is yes, she'll say:  How

18   do you now plead?  If you say guilty then you have to

19   understand then you're guilty, there's no taking it back; if

20   you don't like what happens then, there's no starting over.

21             Are you clear on that?

22   A    Yes, I am, your Honor.

23   Q    All right.  How old are you?

24   A    Your Honor, I'm 29 years old.

25   Q    How far did you go in school?

1    A    I graduated Don Bosco High School, and a half year, half

2    a semester of college.

3    Q    Have you ever been treated for a mental condition?

4    A    No, I haven't.

5    Q    Are you aware of any mental illness that you may have

6    today?

7    A    No, I haven't, your Honor.

8    Q    Are you under the influence of any drug today?

9    A    No, I am not, your Honor.

10   Q    Are you under the influence of alcohol?

11   A    No, I am not, your Honor.

12   Q    Are you taking any medication today?

13   A    No, I am not, your Honor.

14   Q    Do you know what you're charged with to which you are

15   willing to plead guilty?

16   A    Yes, I am, your Honor.

17   Q    Tell me?

18   A    Conspiracy, trafficking in stolen credit cards, having

19   possession of 15 or more credit cards, on about three

20   different occasions.  Ah, using one or more stolen credit

21   card access device.  I think that's twice.

22   Q    Well, that's what you're charged with.

23   A    Yes.

24   Q    But as I read this plea agreement -- let's -- let me

25   show it to you.

1          Is that a plea agreement that you worked out with

2    the government in this case?

3    A    Yes, it is, your Honor.

4    Q    Have you signed it there where what appears to be your

5    signature appears on the last page?

6    A    Yes, I have, your Honor.

7    Q    Have you talked it all over with Mr. Hrones before

8    signing it?

9    A    Yes, I have, your Honor.

10   Q    Do you think you understand it?

11   A    Yes, I do, your Honor.

12   Q    May I see it.

13         As I read it you're prepared to plead guilty to

14   Counts 2, 11, and 13 through 17.  No, 2 is conspiracy, 11,

15   13, 16 and 17 are possession of stolen mail, and 14 is

16   possession of a certain number of credit cards, 15 is

17   trafficking in stolen credit cards.  You're absolutely

18   right.

19         All right.  Well, let's go over these, because

20   they're separate charges and they charge separate

21   misconduct.

22         Conspiracy -- I want to be clear that you know what

23   the government has to prove here before you could be found

24   guilty.

25         Conspiracy requires that the government prove that

1    you and at least one other person agreed both to do

2    something, that you agreed to do something that the law

3    forbids, and then that somebody, not necessarily you, but

4    somebody who was a conspirator took some step to make that

5    happen.  So you have to know what you're doing, you have to

6    agree, and a specific thing in your mind is to agree to do

7    something that the law forbids.  And someone's got to do

8    something to make that come about.

9              Do you understand that?

10   A    Yes, I do, your Honor.

11   Q    Now, on these Counts 11, 13, 16 and 17, that's

12   possession of stolen mail, which means you have to possess

13   it, which means you actually have to have it physically,

14   carry it, or it's got to be within your control or dominion,

15   and you've got to know what it is, you've got to know that

16   it is stolen mail.

17             Do you understand that?

18   A    Yes, I do, your Honor.

19   Q    Then Count 14 charges you with possession of 15 or more

20   stolen credit cards with intent to defraud.  So the

21   government, the government has to prove that you possessed,

22   in the way I just said, you actually physically have to have

23   them, or they've got to be in your control where you can get

24   at them, it has to be 15 or more credit cards, as the normal

25   understanding of the word, they have to be stolen, they have

1    to be not in the custody of the people who have a right to

2    them, or the right at least to process them, and then you've

3    got to know what you have, have the credit cards, know that

4    you've got no right to them, but then further the government

5    has to prove that you intend to use them to defraud, that

6    is, to charge on them yourself or to sell them so that

7    someone can charge on them to defraud the rightful possessor

8    of the credit card from the ability to use it in the manner

9    that it's intended.

10            Do you understand that?

11   A    Yes, I do, your Honor.

12   Q    Now, trafficking in solen credit cards requires that the

13   government prove that you, knowing what you're doing, be

14   engaged in the actual, well, trafficking, the sale or

15   distribution, on a repeated basis, of credit cards that are

16   stolen.

17            Do you understand that?

18   A    Yes, I do, your Honor.

19            **THE COURT:**  Let -- well, let's pause here for a

20   moment.  I understand conspiracy, I think, and I understand

21   possession of stolen mail, I think.  What element of Count

22   14 has to be proved that doesn't appear in any of the other

23   counts?  I want to be sure these are separate charges.

24   That's possession of 15 or more stolen credit cards with

25   intent to defraud.

1           **MR. APFEL:**  The difference between Count 14 and 15,

2     your Honor, is that 14 would require the possession of 15 or

3     more, in this case, stolen credit cards or unauthorized

4     access to devices; whereas 15 would require, it doesn't, it

5     doesn't require possession of any particular number, but

6     requires that through, in this instance the use of those

7     credit cards, Mr. Flaherty obtained more than $1,000 in

8     value during a one year period of time.

9           **THE COURT:**  That's what 15 is, that's what

10    constitutes trafficking, the actual use of -- can it be just

11    one credit card, if you run up fraudulent charges of more

12    than a thousand dollars?

13          **MR. APFEL:**  That's my understanding, your Honor, so

14    long as the thousand dollars obtained is received within a

15    one year time frame.

16          **THE COURT:**  Do you agree with that, Mr. Hrones?

17          **MR. HRONES:**  Yes, your Honor.

18          **THE COURT:**  All right.  Well, I appreciate it.

19    **Q**   Let me explain.  It's a little different than what I

20    told you.

21    A   Okay.

22    **Q**   And we've got to be clear what we're talking about.

23          This trafficking doesn't sound to me what I would

24    think of as trafficking.  But what 15 charges you with is

25    one or more of these stolen credit cards, knowing that it

1    was stolen, stolen, using them, fraudulently, to obtain over

2    $1,000 within a one year period.

3              Do you understand that?

4    A    No, I don't, your Honor.

5    Q    Okay.  What don't you understand about it?

6    A    Are you saying that I used a credit card or I sold a

7    credit card, is it the same?

8    Q    In my mind he just explained it to me as used it.

9              MR. APFEL:  Well, by, by use it would mean use or

10   transfer with the understanding that he was going to be

11   obtaining --

12             THE COURT:  So if he sold it, if he was selling

13   credit cards rather than using them --

14             MR. APFEL:  Oh, that would certainly be a form of

15   use.

16             THE COURT:  A thousand dollars within a year's

17   time, that violates this statute.

18             MR. APFEL:  That's correct, your Honor.

19             THE COURT:  I'll accept that amendment.

20   Q    And does that clear up your question?

21   A    Yes, it does, your Honor.

22   Q    All right.  Now, you're charged with those crimes and

23   that means that the government has to prove each of those

24   things that we've talked about beyond a reasonable doubt.

25             Do you understand that?

1   A    Yes, I do, your Honor.

2   Q    Now, when we talk about proof, we mean a trial.  A trial

3   at which you have a right that a jury will decide that.  Not

4   me, not anyone else, but a jury of the people.  You would

5   have something to say in the picking of that jury, through

6   Mr. Hrones, who they would be.

7        At that trial the government would have to put on

8   evidence, evidence to prove these various points.  You would

9   have a chance to look those witnesses right in the eye.  You

10  can sit there right at counsel table, look at the witnesses.

11  Mr. Hrones would have a chance to question them, to argue to

12  the jury, to suggest to the jury that there is a reasonable

13  doubt as to one or more of the essential elements here.  You

14  don't have to do a single thing.  You don't have to testify.

15  You don't have to explain anything.  The burden is now, and

16  it will remain throughout, on the government.

17       Last, though you say you want to plead guilty,

18  you're presumed to be innocent and I treat you as an

19  innocent person.  I'm required to and I do and I will tell

20  the jury to.

21       Do you understand that?

22  A    Yes, I do, your Honor.

23  Q    If you plead guilty all of those things are gone.

24  There's never going to be a trial.  We'll never get to see

25  the evidence that the government has against you.  I will

1    ask the government counsel to tell me what evidence he hopes

2    he can put before the jury, then I'm going to ask you

3    whether that's true, but I'm going to rely just on what he

4    tells me.

5              Your right to be silent about these offenses, that

6    right is gone.  If you're guilty of these offenses then a

7    Fifth Amendment right to be silent is not important.  Or

8    under the constitution it's not important.  For instance, if

9    Mr. Nuzzo does not plead guilty you can be called as a

10   witness in his trial, or if someone else is involved.  You

11   can be called before, if someone else is in the conspiracy,

12   you can be called before a grand jury and required to

13   testify about that.

14             Are you clear on that?

15   A   Yes, I am, your Honor.

16   Q   All right.  And not the least important you go from

17   being not guilty in my eyes to being guilty and all that

18   will remain is what sentence I am going to impose upon you.

19             Do you understand that?

20   A   Yes, I do, your Honor.  Can I have a minute to confer

21   with my attorney?

22             **THE COURT:**  Of course you may.

23             (Whereupon Mr. Hrones and Mr. Flaherty conferred.)

24   A   I'm all set, your Honor, thank you.

25   Q   Have you had enough time to talk with Mr. Hrones?

1    A    Yes, I have.

2    Q    Anything you want to ask me?

3    A    No, your Honor, I'm clear on that point.

4    Q    All right.  Let's talk about what may happen.

5              Under the law the maximum penalty for each of these

6    counts, it varies, for the conspiracy count, the maximum

7    penalty is five years, for each of the possession of stolen

8    mail counts it's five years, for possession of the 15 or

9    more credit cards it's ten, and for the selling, the

10   trafficking in stolen credit cards, it's ten.

11             Because these are separate crimes, that's why I

12   asked the lawyer, I said what's separate about these, how

13   are these, do they require separate things be proved,

14   theoretically, I can add these all up and that comes out to

15   a total of a maximum of 45 years in prison.

16             Likewise, on each of the counts, and there are

17   seven of these counts, I can impose a fine of up to $250,000

18   or twice the gross gain to you or the gross loss to others,

19   whichever is larger.

20             Now, that means I can, because these are separate,

21   I can go seven times $250,000, putting aside the, the gross

22   amounts of gain or loss, which comes to $1,750,000.  I can

23   also order restitution, that is, I can order you to pay back

24   the people whom you defrauded, impose upon you a period of

25   supervised release of up to three years, and a mandatory

1    special assessment on each count of $50 I have to impose

2    upon you, that comes out to $350.

3              Do you understand that?

4    A    Yes, I do, your Honor.

5    Q    Now, congress also passes a law called the sentencing

6    guidelines.  The goal of the sentencing guidelines is to see

7    to it that people who commit roughly the same crimes get

8    roughly the same sentences.  And in this case, apparently

9    the agreement here gives the framework for the sentencing

10   guideline sentence.  And the way it works is, the sentencing

11   guidelines are complex, but the way it works is, once the

12   sentencing guidelines have been worked out it gives a frame

13   of reference and I cannot go above the top of the area

14   within which I can sentence, but I can't go below the bottom

15   of the area within which I sentence, unless there are very

16   special, very extraordinary reasons.  And I see here that at

17   least as between you and the government everyone agrees that

18   there's no special reason to go higher than the top or lower

19   than the bottom.

20             Do you understand that?

21   A    Yes, I do, your Honor.

22             THE COURT:  What is the sentencing guideline

23   calculation as the government calculates it; what does it

24   come out to?

25             MR. APFEL:  As the government calculates it, your

1    Honor, with three points for acceptance of responsibility,

2    the base offense level will end up after all the

3    calculations are done at 13.  My current understanding is

4    that Mr. Flaherty's criminal history category would be

5    category I, so that he would fall in the 12 to 18 month

6    sentencing range.

7           **THE COURT:**  All right.

8    **Q**    I ask him not because your attorney can't dispute that,

9    and I'll listen to the probation officer, too, if it's

10   necessary, but the likelihood is that the government will

11   take the highest position, so I want you to know what may

12   happen.  So, just for talking he's saying the way this is

13   going to work out is that I impose a sentence on you of not

14   less than 12 months nor more than 18 months.

15          Do you understand that?

16   **A**    Yes, I do, your Honor.

17   **Q**    And you understand that they take the position here that

18   they'll make a recommendation somewhere within that range,

19   but they haven't, they haven't been specific about where

20   within that range.

21          Is that how you understand it?

22   **A**    Yes, I do, your Honor.

23          **THE COURT:**  Let me ask the government, is there any

24   need to wait for a presentence report here, it seems to me

25   you've got everything worked out.

1          **MR. APFEL:**  I believe there's no need to wait, your
2     Honor.
3          **THE COURT:**  Mr. Hrones, do you agree with that?
4          **MR. HRONES:**  No, I don't agree with that.  There
5     still is a range available to --
6          **THE COURT:**  Oh, of course there's a range.  Of
7     course there's a range.
8          **MR. HRONES:**  And --
9          **THE COURT:**  But why shouldn't I dispense with the
10    presentence report, let you argue the range and impose
11    sentence?
12         **MR. HRONES:**  Because we don't have the necessary
13    information.  For instance, he's in a treatment program now
14    and he's doing very well.  And by the time sentencing comes,
15    we will have a better picture of how he's done in that
16    program.
17         **THE COURT:**  All right.  All right.
18    **Q**   Do you know that if you're not a citizen of the United
19    States conviction of the offense of which you, offenses of
20    which you say you want to plead guilty may have the
21    consequence of you being deported, denied admission to the
22    United States, denied naturalization under the laws of the
23    United States?
24         Do you understand that?
25    A   Yes, I do, your Honor.

1    **Q**   Now, other than the promises that the government makes

2    to you in this presentence, in this plea agreement that

3    they're going to, that you're only pleading to part of it

4    and they don't think there's an upward departure and the

5    other promises that they make to you here, has anyone made

6    any promise to you to get you to plead guilty?

7    A    No, they haven't, your Honor.

8    **Q**   Has anyone threatened you with anything in order to get

9    you to plead guilty?

10   A    No, they haven't, your Honor.

11   **Q**   Are you covering up for anyone else by pleading guilty

12   yourself?

13   A    Absolutely not, your Honor.

14   **Q**   I'm going to ask the government now then to tell me what

15   evidence they hope, tell me briefly, that they hope that

16   they could introduce in your trial.  I'm going to ask you

17   whether you've heard it, I'm going to ask you whether it's

18   true.

19              **THE COURT:**  Counsel?

20              **MR. APFEL:**  Your Honor, if the case were to go to

21   trial, a summary of the evidence the government would hope

22   to put on would include the following.

23         The time frame relevant to this indictment as to

24   Mr. Flaherty is the period of April 1991 through July 1992.

25   During that time frame, as well as before and after, but for

1  our purposes during that time frame, the United States

2  Postal Service had a contract with Northwest Airlines

3  pursuant to which Northwest Airlines would transport certain

4  mails from an airport in Minneapolis to, to Logan here in

5  Boston.

6          At the same time, Citibank issued, manufactured and

7  issued its credit cards for all of its New England credit

8  card holders in Sioux Falls, South Dakota.  Citibank would

9  introduce those credit cards into the mails in Sioux Falls,

10  they would be transported by truck to Minneapolis where they

11  would be placed on Northwest Airlines airplanes and flown to

12  Logan.

13          At the same time a company called First Data

14  Resources, which makes credit cards for a number of smaller

15  banks, also manufactured its credit cards not in Sioux Falls

16  but in Omaha, Nebraska.  FDR, or First Data Resources, would

17  introduce its credit cards into the mail in Omaha, Nebraska

18  and they would be transported from Minneapolis, again loaded

19  on Northwest Airlines airplanes and flown to Logan Airport.

20          Mr. Flaherty, as well as certain other individuals,

21  whose names I'll mention in a moment, were baggage handlers

22  working for Northwest Airlines at Logan Airport during this

23  time frame.

24          With respect to Count 2 of the indictment, which

25  charges Mr. Flaherty with conspiracy, during the relevant

1   time frame Mr. Flaherty entered into an agreement with an

2   individual named Joseph Faretra, as well as others, Joseph

3   Faretra being another Northwest Airlines baggage handler,

4   and the agreement was that they would steal credit cards

5   from the mails coming in on Northwest Airlines together and

6   then they would either go their separate ways with the cards

7   or on occasion what would happen is that Mr. Flaherty would

8   give cards that he had stolen to Mr. Faretra with the

9   understanding that Mr. Faretra had a good outlet, had a good

10  fence for these cards.  And whenever Mr. Flaherty would give

11  Mr. Faretra certain cards to, to distribute through Mr.

12  Faretra's outlet, the understanding was that once Mr.

13  Faretra had been paid by his fence or paid by his outlet

14  that he would return a certain percentage of the proceeds to

15  Mr. Flaherty.  The basic agreement is that Mr. Faretra would

16  return to Mr. Flaherty ten percent of what was the available

17  credit limit on the cards that Mr. Flaherty had, had stolen.

18          Mr. Flaherty used his cards personally primarily to

19  support what was then a cocaine habit as well as to support

20  a gambling habit.  In fact, Mr. Flaherty during this period

21  of time was known to gamble quite a bit and was a notorious

22  loser.  In fact, he gained the, he gained the nickname

23  amongst Northwest baggage handlers, he was called "Eddie the

24  Curse" because of his, of his, not his gambling proclivity

25  but his feats in gambling.

1          The individual who, through whom Mr. Faretra would

2     distribute credit cards stolen credit cards was an

3     individual by the name of Peter Mastrangelo who has

4     previously pled guilty in this court before Judge Gertner.

5     Mr. Faretra has also pled guilty in this court before Judge

6     Keeton.

7          That is a summary of the government's evidence as

8     to Count 2.  Certain of the overt acts that are listed in

9     Count 2, or that are spelled out and are made into

10    substantive accounts later in the indictment, as to the

11    substantive counts to which Mr. Flaherty will be pleading

12    guilty, first substantive Count Number 11, that is a

13    possession of stolen mails count.

14         The evidence as to that count would be that in the

15    summer of 1991, at a place called Santino's Club in East

16    Boston, Mr. Flaherty used credit cards that he had stolen

17    from the mails coming in through Northwest Airlines in order

18    to pay off certain gambling debts.  And he, he paid off

19    these debts to another individual at Santino's in the

20    presence of Mr. Faretra.

21         The government's evidence as to Counts 13, 14 and

22    15, 13 being a possession of stolen mails count, 15 being a

23    possession of 15 or more --

24         **THE COURT:**  All right, I'm following it.

25         **MR. APFEL:**  Okay.  14 and 15, those three counts

1    relate to a single event that occurred between December 18th

2    of 1991 and January 7 of 1992.   In the aggregate those three

3    counts refer to that period.

4          During that period Mr. Flaherty and Mr. Faretra

5    stole a large number of cards.   The evidence would be that

6    the number of cards they stole was in excess of 75.

7    Mr. Flaherty gave all of his cards to Mr. Faretra with the

8    understanding that Mr. Faretra was going to be moving those

9    cards or distributing those cards through Mr. Mastrangelo

10   and that Mr. Flaherty would be paid off to the tune of ten

11   percent of the available credit limit on the cards he was

12   giving to Mr. Faretra.

13         Mr. Mastrangelo was given the cards and he went off

14   to Las Vegas with a group of, with a crew that was working

15   for him and obtained numerous sizable cash advances at

16   casinos in Las Vegas using, using the credit cards that had

17   been provided to him by Mr. Faretra and which come

18   originally from both Mr. Faretra and Mr. Flaherty.

19         When Mr. Mastrangelo returned, returned from Las

20   Vegas, he paid a substantial sum of money to Mr. Faretra and

21   Mr. Faretra in turn turned around and gave in excess of

22   $1,000 to Mr. Flaherty as his proceeds from this endeavor.

23         That would be a summary of the government's

24   evidence as to Counts 13, 14 and 15.

25         Count 16 is another possession of stolen mails

1      count.  It relates to an incident that occurred on February

2      28th of 1992.  On that date, Mr. Flaherty received in excess

3      of ten stolen credit cards from an individual in front of

4      Dunkin' Donuts in East Boston, Massachusetts.  Mr. Flaherty

5      knew at the time that he received the cards that they had

6      been stolen from the mails at Northwest Airlines.

7             Finally, as to Count 17, which is the last count in

8      the indictment to which Mr. Flaherty is pleading guilty, it

9      relates to an incident that occurred on July 23rd and 25th

10     of 1992.  On the 23rd, Mr. Flaherty and Mr. Faretra flew out

11     to California together.  Mr. Flaherty had at least two

12     stolen credit cards in his possession at that time.  He used

13     the stolen credit cards in Los Angeles to rent a limousine,

14     to buy various and sundry items in a hotel, as well as to

15     purchase an airline ticket to Las Vegas.  And he and Mr., he

16     and Mr. Faretra flew to Las Vegas during that, from Los

17     Angeles on July 24th, at least during that time frame

18     between the 23rd and the 25th and spent an evening in Las

19     Vegas before flying back to Massachusetts.  That would be

20     the government's evidence as to Count 17.

21            And I believe that is a fair summary of what the

22     government would offer to prove at the trial, your Honor.

23            **THE COURT:**  Thank you.

24     **Q**   Have you heard what the Assistant United States Attorney

25     had to say?

1    A    Yes, I have, your Honor.

2    Q    Do you understand it?

3    A    Yes, I do, your Honor.

4    Q    Is it true?

5    A    Most of it's true, your Honor, except for the part of,

6    to the best of my knowledge, myself paying off a bookie with

7    credit cards.  I can't seem to recollect that.  I don't

8    think any bookie would take a credit card, they usually deal

9    in the cash game, your Honor.

10   Q    Well, that's Count 11 as I understand it.

11            Now, is it that you don't remember and therefore

12   you don't challenge what he has to say, or that you are

13   willing to plead guilty but you're not admitting that that's

14   true.  Now, you can do that, if you want to get it over

15   with, you can do that.  I can take a plea even though you

16   don't admit that that's true.  But you must understand that

17   I will accept what he said as true.  Well, technically, at

18   least as true for the purposes of your being guilty of the

19   crime, I will accept it with respect to the sentence, I may

20   well listen to what the probation officer tells me.  I won't

21   let your attorney say that it's not true.  But the probation

22   officer has to do an independent investigation.

23            Do you understand those options?

24   A    Yes, I do, your Honor.

25   Q    Now, with respect to that charge, paying off gambling

1    debts, can you tell me what your position is?

2    A    At this time, your Honor, I have no recollection, but I

3    am willing to plead guilty to that count.

4    Q    All right.  Now, you understand that this plea agreement

5    that you entered into with the government in no way is

6    binding on me.  What's binding on me is the law.  And the

7    law has the maximum that I have explained to you, if I add

8    them all together, of 45 years, and the sentencing

9    guidelines have some minimum and some maximum, as we work

10   them out, and I'm bound to stay within them, unless I come

11   to the conclusion that there's some very special and unique,

12   and it would be rare, but it happens, reason either to go up

13   or go down.

14            Do you understand that?

15   A    Yes, I do, your Honor.

16   Q    And even though you and the government have agreed that

17   you don't see any reason either to go down or to go up, and

18   that binds the government, they can't be heard that they're

19   going to argue for an upward departure and your lawyer can't

20   argue for a downward departure, I can still, once I've

21   listened to probation, think either that these crimes are so

22   egregious or there's something in your background that

23   warrants me going up on the one hand or down on the other.

24            Do you understand that?

25   A    Yes, I do, your Honor.

1    **Q**    And while that's rare that's within my power.

2            Are you clear on that?

3    A    Yes, I am, your Honor.

4    **Q**    And that I'm not part of this agreement.  You understand

5    that?

6    A    Yes, I do, your Honor.

7    **Q**    Have you had enough time to talk it all over with

8    Mr. Hrones?

9    A    Yes, I have, your Honor.

10   **Q**    Have you listened to what -- I don't need to know what

11   he's advised you, it's not my business, but have you

12   listened to his advice to you in this case?

13   A    Very carefully, your Honor.

14   **Q**    And do you think he has fairly represented you, gotten

15   for you those things which are your rights here in a

16   criminal proceeding?

17   A    Yes, I do, your Honor.

18   **Q**    Do you -- is it your choice, without people threatening

19   you or promising you anything other than what was bargained

20   for here in the agreement, is it your choice to plead guilty

21   to these counts?

22   A    Yes, it is, your Honor.

23            **THE COURT:**  All right, I find that Mr. Edward

24   Flaherty knowingly, intelligently, and voluntarily exercises

25   his right to plead guilty to certain counts of this

multi-count indictment and the clerk may accept the plea.

**Q**   Now, Mr. Flaherty, this is the key point.  Because up to and now you can just stop us and say no, I've thought about it, I'm going to take my trial.  But when the clerk asks you whether you're guilty or not guilty, if you say guilty then you're guilty and there's no taking it back.

Are you clear on that?

A   Yes, I am, your Honor.

**Q**   Now, she's going to ask first whether you want to change your plea.  If you do tell her yes, and then she'll ask you how do you plead, guilty or guilty, and if you say guilty then you're guilty.

Do you understand?

A   Yes, I do, your Honor.

**THE COURT:**  The clerk may accept the plea.

**THE CLERK:**  Edward Flaherty, you have previously pled not guilty to a 25 count indictment charging you with violation of Count 2, 18 U.S.C., Section 371, conspiracy, Counts 11, 13, 16, and 17, 18 U.S.C., Section 1708, mail theft, and Counts 14 and 15, 18 U.S.C., Section 1029(a)(2), access device fraud.

Do you now want to change your plea from not guilty to guilty?

**THE DEFENDANT:**  Yes, I do.

**THE CLERK:**  What say you now to Counts 2, 11 and 13

1    through 17, guilty or not guilty?

2           **THE DEFENDANT:**  Guilty.

3           **THE COURT:**  You may step down, thank you.

4           **THE DEFENDANT:**  Thank you, your Honor.

5           (Whereupon the defendant stepped down.)

6           **THE COURT:**  I propose the 25th of May at 2:00 p.m.

7    for disposition.

8           **MR. APFEL:**  That's fine with the government, your

9    Honor.

10          **THE COURT:**  And Mr. Hrones?

11          **MR. HRONES:**  Yes, that's fine.

12          **THE COURT:**  Very well.

13          Now, Mr. Hrones and Mr. Flaherty, I instruct you

14   that today you're to go to the Department of Probation and

15   tell them of the changed situation with respect to the plea

16   so that a presentence report may be prepared.

17          Now, something to the government, and I want to say

18   this carefully because I'm not impugning the government in

19   any way and I certainly am not faulting you, but it has come

20   to my attention that in some cases the complete government

21   file is not made available to the probation officer.  Now,

22   the probation officer is an officer of this Court and acts

23   on my authority to independently investigate and advise me.

24   And I expect all the calls to be returned, and I expect she

25   or he to have access to every scrap of paper you have

1    promptly.

2            Are we understood?

3            **MR. APFEL:**  Oh, absolutely, your Honor.

4            **THE COURT:**  I didn't suggest to the contrary.  But

5    I want it understood.

6            Very well.  All right.  Same, same conditions of

7    bail in the interim?

8            **MR. APFEL:**  Same conditions, your Honor.

9            **THE COURT:**  Very well.  We'll recess.

10           (Adjournment.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3

4          I, Donald E. Womack, Official Court Reporter for

5     the United States District Court for the District of

6     Massachusetts, do hereby certify that the foregoing pages

7     are a true and accurate transcription of my shorthand notes

8     taken in the aforementioned matter to the best of my skill

9     and ability.

10

11

12

13

14              /S/ DONALD E. WOMACK 9-29-2014
              _____
15              DONALD E. WOMACK (Ret.)
                Official Court Reporter
16                 P.O. Box 51062
            Boston, Massachusetts 02205-1062
17              womack@megatran.com

18

19

20

21

22

23

24

25